UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CAPITAL FINANCIAL PARTNERS, LLC,<br>CAPITAL FINANCIAL HOLDINGS, LLC,<br>CAPITAL FINANCIAL PARTNERS<br>   ENTERPRISES, LLC,<br>WILLIAM D. ALLEN and<br>SUSAN C. DAUB,<br><br>Defendants,<br><br>and<br><br>WJBA INVESTMENTS, LLC,<br>INSURANCE DEPOT OF AMERICA LLC,<br>SIMPLIFIED HEALTH SOLUTIONS LLC and<br>SIMPLIFIED HEALTH SOLUTIONS 2, LLC,<br><br>Relief Defendants. | Case No.<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendants Capital Financial Partners, LLC, Capital Financial Holdings, LLC, Capital Financial Partners Enterprises, LLC, William D. Allen, and Susan C. Daub, and relief defendants WJBA Investments, LLC, Insurance Depot of America LLC, Simplified Health Solutions LLC, and Simplified Health Solutions 2, LLC, and hereby demands a jury trial:

# PRELIMINARY STATEMENT

1.     This case involves an ongoing fraudulent offering and Ponzi scheme orchestrated by William D. Allen ("Allen") and Susan C. Daub ("Daub"), acting through two Massachusetts-based companies, Capital Financial Partners, LLC and Capital Financial Holdings, LLC, and one Florida-based company, Capital Financial Partners Enterprises, LLC (collectively, "Capital Financial"). Allen and Daub represent that Capital Financial is in the business of making loans to professional athletes who need money while they wait to get paid under their sports contracts (*i.e.*, during the off-season). Allen and Daub tell investors that they can participate in some or all of the funding for a specific loan to a specific athlete. Investors receive copies of purported loan documents and a schedule of monthly repayments reflecting interest rates of 9% to as much as 18% on loans lasting from a few months to a few years.

2.     From July 2012 through February 2015, Allen and Daub raised approximately $31.7 million from at least forty investors. During the same period, Capital Financial advanced approximately $18 million to athletes. In other words, Allen and Daub obtained approximately $13.7 million more from investors than they actually advanced to the athletes whose loans the investors are supposedly funding. Allen and Daub have used false documentation in order to mislead investors as to the terms, circumstances, and even existence of some of the loan transactions in which the investors are induced to participate. Allen and Daub have withdrawn more than $7 million of the investors' money to pay personal expenses or to fund other business ventures.

3.     From July 2012 through February 2015, Capital Financial paid approximately $20 million to investors. During the same period, Capital Financial received approximately $13.2 million of loan repayments from athletes. In other words, Allen and Daub have paid

nearly $7 million more to investors than they have generated through Capital Financial's lending business. To accomplish this, Allen and Daub have recycled money from some investors to pay other investors. In short, besides using fraud to obtain the investors' money, Allen and Daub are operating a Ponzi scheme.

4. Through the activities alleged in this Complaint, the defendants have engaged and are still engaged in: (a) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and (b) fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act").

5. To halt the defendants' ongoing unlawful conduct, maintain the status quo, and preserve any remaining assets for defrauded investors before entry of a final judgment, the Commission seeks emergency equitable relief, including a temporary restraining order and preliminary injunction, to: (a) prohibit the defendants from continuing to violate the relevant provisions of the federal securities laws; (b) freeze the defendants' and relief defendants' assets; (c) require the defendants and relief defendants to submit an accounting of investor money and other assets in their possession; (d) require the defendants and relief defendants to repatriate all money obtained from investors that is now located outside the United States; (e) prohibit the defendants from soliciting or depositing money from actual or prospective investors and from opening new accounts at any bank, brokerage firm, or other financial institution; (f) prevent the defendants and relief defendants from destroying relevant evidence; and (g) authorize the Commission to undertake expedited discovery.

6. The Commission also seeks: (a) a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws;

(b) disgorgement of the defendants' and relief defendants' ill-gotten gains, plus prejudgment interest; and (c) civil penalties due to the egregious nature of the defendants' violations.

## JURISDICTION

7. The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

8. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa]. Venue is proper in this District because two of the corporate defendants are organized here and a significant number of the investors are located here.

9. In connection with the conduct described in this Complaint, the defendants directly or indirectly have made use of the mails or the means or instruments of transportation or communication in interstate commerce.

10. The defendants' conduct has involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and has resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

11. **Capital Financial Partners, LLC** ("CFP") is a Massachusetts limited liability company organized in June 2012. Its founders and managers are Allen and Daub. Its business address is in Boston, Massachusetts. It is a party to most of the investor participation agreements

4

and purported athlete loan documents. Its bank accounts have received investor money and have been used to make loans to athletes and payments to investors.

12. **Capital Financial Holdings, LLC** ("CFH") is a Massachusetts limited liability company organized in April 2014. Its founders are Allen and Daub, and its manager is CFP (*i.e.*, Allen and Daub). Its business address is in Boston, Massachusetts. It is a party to some of the investor participation agreements and purported athlete loan documents.

13. **Capital Financial Partners Enterprises, LLC** ("CFPE") is a Florida limited liability company organized in December 2013. Its founders and managers are Allen and Daub. Its business address is in Coral Springs, Florida. Its bank accounts have received investor money and have been used to make loans to athletes and payments to investors.

14. **William D. Allen**, age 36, lives in Davie, Florida. He is a founder of the three Capital Financial defendants and the four relief defendants. He is a manager of CFP, CFPE, and the relief defendants. Prior to his involvement with Capital Financial, he was in the National Football League. Between 2001 and 2012, he played for the New York Giants and Miami Dolphins. In March 2012, he was signed by the New England Patriots, but in August 2012, he was placed on injured reserve, and he left football in March 2013. He lived in Foxboro, Massachusetts, from June 2012, when he and Daub founded CFP, until February 2013.

15. **Susan C. Daub**, age 54, previously lived in Acton, Massachusetts, and now lives in Coral Springs, Florida. She is a founder of the three Capital Financial defendants and two of the relief defendants. She is a manager of CFP, CFPE, and two of the relief defendants. For many years prior to her involvement with Capital Financial, she was registered with the Commission as a representative of various broker-dealers and investment advisers. She was also employed as a life insurance agent and a private banker.

5

## RELIEF DEFENDANTS

16. **WJBA Investments, LLC** ("WJBA") is a Delaware limited liability company organized in June 2009. Its business address is in Davie, Florida. It is managed by Allen.

17. **Insurance Depot of America LLC** ("Insurance Depot") is a Florida limited liability company organized in August 2013. Its business address is in Weston, Florida. It is managed by Allen and purports to offer insurance products.

18. **Simplified Health Solutions LLC** and **Simplified Health Solutions 2, LLC** (collectively, "Simplified Health") are Florida limited liability companies organized in December 2013 and July 2014 respectively. Their business address is in Coral Springs, Florida. They are managed by Allen and Daub and purport to offer insurance products.

## STATEMENT OF FACTS

### The Business of Capital Financial

19. Capital Financial represents that it is in the business of making short-term loans, primarily to professional athletes in Major League Baseball, the National Football League, the National Basketball Association, and the National Hockey League. As its website explains:

> In many cases, athletes' contracts do not allow them to access their guaranteed money during the off season or early in the season when they may need a significant sum to purchase a house or car, pay the bills, or meet a financial demand. By pooling the resources of a network of investors, CFP gives athletes access to money when they need it while providing investors with solid, short-term returns on investment.

According to the website, Capital Financial offers "flexible repayment schedules customized to the contracts of each athlete, accelerated closing times and a significant pool of loanable assets."

20. Capital Financial advertises that its loans begin at $75,000 and that athletes typically borrow $600,000 for a twelve-month period. According to the website, the stated

6

interest rate on the loans ranges from 9% to 18%. Because some loans are for only a few months, the annualized interest rate can exceed 100% in some cases.

21. When Capital Financial makes a purported loan to an athlete, it typically prepares a loan agreement, a promissory note by the athlete, a direct deposit agreement with his team (so that some or all of the athlete's contract payments are deposited in an account to which the company has access), and a closing statement indicating the disbursement of the loan proceeds. At least one athlete purportedly entered into a security agreement providing Capital Financial with a security interest in his contract and certain real estate.

22. When Capital Financial makes a purported loan to an athlete, it typically receives an "origination fee" of 3% of the amount of the loan. The origination fee and other charges such as legal expenses are subtracted from the amount of the loan proceeds that the athlete purportedly receives.

23. Allen and Daub share responsibility for operating Capital Financial's business. Daub typically presents investors with new loan opportunities and serves as the primary contact for investor questions. Allen typically wires periodic payments to investors and responds to questions about the payments. They each have signed or witnessed investor participation agreements and purported athlete loan documents on behalf of Capital Financial.

**The Defendants' Pitch to Investors**

24. Allen and Daub present prospective investors with the opportunity to participate in some or all of the funding for a specific loan to a specific athlete. Prospective investors typically receive a term sheet or a draft loan agreement identifying the athlete, the interest rate of the loan, the duration of the loan, and the amount of the origination fee. The term sheet usually indicates that Capital Financial will not make the loan until the athlete has executed a direct

7

deposit agreement and the company has received all the signed documentation.

25. Before investors decide to participate in a loan, Capital Financial typically provides them with information about the athlete's sports contract, including whether the amounts that the team owes to the athlete are guaranteed. Investors are often led to believe that their investment with Capital Financial is backed by the athlete's contract, meaning that Capital Financial receives repayments directly from the athlete's team or could do so if necessary.

26. If they decide to participate in some or all of a particular loan, investors enter into an "investor agreement" or "participation agreement" with Capital Financial that specifically identifies the athlete, the amount of the loan, and the schedule of repayments. In some of the agreements, Capital Financial represents that it has already made the loan to the athlete, and that the investors will have a proportionate beneficial interest in the company's right to receive loan repayments. In other agreements, Capital Financial represents that it intends to use the investors' money to fund the loan, and that it will repay the investors when the athlete repays the loan. In some agreements, Capital Financial represents that it will make a payment to the investors within two days after it receives a repayment from the athlete. Some agreements provide that the investors receive a "security interest" in the loan documents.

**The Use of Fraud to Obtain the Investors' Money**

27. Bank records indicate that, from July 2012 through February 2015, Capital Financial advanced approximately $18 million to athletes. During the same period, Allen and Daub raised approximately $31.7 million from at least forty investors. The gulf between investor money received and athlete loans made is growing. From June 2014 through February 2015, Capital Financial received approximately $9.5 million from investors but advanced approximately $4 million to athletes. From the outset, investors have been told, and the

8

documentation they received has confirmed, that their money would be used to fund specific loans to specific athletes. By raising nearly $14 million more from investors than they advanced to athletes, Allen and Daub knowingly or recklessly induced investors to participate in loans that Capital Financial did not actually make.

28. In April and May 2014, at least twenty-four investors invested more than $4 million to participate in a purported $5.65 million loan to a NHL player. Daub provided some of the prospective investors with a purported copy of a $5.65 million promissory note signed by the player and a loan agreement signed by the player and by Allen. Daub told some of the prospective investors that the player would make monthly payments in accordance with the schedule in the loan documents. The purported $5.65 million loan to the NHL player was a sham. The player did not sign the $5.65 million promissory note or the loan agreement shown to prospective investors. Capital Financial did not make a $5.65 million loan to the player.

29. On October 7, 2014, the NHL player filed for bankruptcy and listed Capital Financial among his creditors. On February 9, 2015, Capital Financial filed a proof of claim in the amount of $3,429,750 and attached a $3.4 million promissory note signed by the player and a loan agreement. The documents that Capital Financial submitted to the bankruptcy court concerning the $3.4 million loan are dated April 14, 2014 – exactly the same day as the phony documents concerning the supposed $5.65 million loan to the same player that Allen and Daub used to persuade investors to part with more than $4 million.

30. On November 21, 2014, more than six weeks after the NHL player filed for bankruptcy, Daub sent an email to the investors involved in the transaction assuring them that the player's loan was "performing as expected." Daub did not mention that the actual loan was for $3.4 million, not $5.65 million. Further, she stated that "[a]ll payments have been made in full

and on time," when in fact Capital Financial told the bankruptcy court that the player had made no repayments at all.

31. The investors who participated in the purported $5.65 million loan have received monthly wire payments from Allen in amounts consistent with the player's supposed repayment obligations. Since the player has paid nothing to Capital Financial, the money for these repayments has necessarily come from other sources. Bank records indicate that such sources include loan repayments by other athletes and money from other investors.

32. Allen and Daub have induced investors to participate in other loans that Capital Financial did not actually make. On August 22, 2014, an investor signed a participation agreement to fund a $300,000 loan to a Major League Baseball player. In the participation agreement, Capital Financial represented that it had already made the loan, and the investor was given copies of a $300,000 promissory note and a loan agreement dated August 20, 2014. However, Capital Financial's bank records reflect no payments to this player on or before the date of the supposed loan. Bank records indicate that Capital Financial used the money obtained from this investor to meet monthly payment obligations to other investors and to fund one of Allen's personal business ventures.

33. In late February 2015, at least two investors provided a total of $200,000 which they were told would be used to fund a $1.7 million loan to a National Football League player. At least one of the investors received a participation agreement in which Capital Financial represented that it had already made the $1.7 million loan. However, Capital Financial's bank records reflect no payments to this player on or before the date of the supposed loan.

**The Ponzi Scheme**

34. From July 2012 through February 2015, Capital Financial received approximately

10

$13.2 million of loan repayments from athletes. During the same period, the company paid approximately $20 million to investors. Lacking any other significant source in revenue, it is apparent that Capital Financial managed to pay nearly $7 million more to investors than it received from athletes only because Allen and Daub recycled a substantial portion of the approximately $31.7 million raised from investors. In other words, they used money from some investors to pay other investors, while at the same time funneling millions of dollars of investor money to themselves – the hallmarks of a Ponzi scheme.

**The Diversion of the Investors' Money**

35. Bank records indicate that, from July 2012 through February 2015, Allen and Daub withdrew more than $7 million – far more than Capital Financial could have earned as fees from its lending business, even if all the loans were real. Allen and Daub used the money for personal expenses and unrelated business ventures.

36. Allen and Daub took out approximately $1.4 million in the form of cash withdrawals and personal credit and debit card purchases. Capital Financial's bank records do not indicate that the cash was withdrawn for either athlete loans or payments to investors. The cash withdrawals are not consistent with other bank record activity for athlete loans or payments to investors. The pattern of cash withdrawals does not appear consistent with any legitimate business use or practice. Likewise, the personal card purchases are not consistent with any legitimate business use or practice, but are consistent with the purchases being made for Allen and Daub's personal benefit. For example, the card purchases include, among other things, charges at casinos, pawn shops, jewelers, grocery stores, cigar shops, and clothing retailers. Additional card purchases made at storage facilities, airlines, hotels, restaurants, night clubs, and limousine companies are not included in the $1.4 million total above.

37. Apart from cash withdrawals and card charges, Allen received the net amount of at least $3.7 million, primarily in the form of wire transfers to his personal bank account and to accounts in the name of WJBA. He also used approximately $200,000 to pay creditors holding judgments against him for outstanding debts, including a mortgage company, a credit card issuer (by way of a collection agency), and a casino resort.

38. Apart from cash withdrawals and card charges, Daub received the net amount of approximately $196,000.

39. Insurance Depot and Simplified Health received the net amount of approximately $890,000. Capital Financial's bank records characterize some of the transfers to these companies as "loans". Investors were not told that their money would be loaned to an insurance business.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

40. The Commission repeats and incorporates by reference the allegations in paragraphs 1-39 of the Complaint as if set forth fully herein.

41. The investments offered by the defendants constitute a "security" for purposes of Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

42. The defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon

certain persons.

43. As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

44. The Commission repeats and incorporates by reference the allegations in paragraphs 1-43 of the Complaint as if set forth fully herein.

45. The investments offered by the defendants constitute a "security" for purposes of Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

46. The defendants, directly and indirectly, acting intentionally, knowingly or recklessly, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

47. As a result, the defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment of Relief Defendants)

48. The Commission repeats and incorporates by reference the allegations in paragraphs 1-47 of the Complaint as if set forth fully herein.

49. The relief defendants have no legitimate interest in, or right to, the funds they received directly or indirectly from Capital Financial, which represent proceeds of the fraud alleged above.

50. As a result, the relief defendants are liable for unjust enrichment and should be required to disgorge their ill-gotten gains, with prejudgment interest.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A. Enter a temporary restraining order, preliminary injunction, order freezing assets, and order for other equitable relief in the forms submitted with the Commission's motions for such relief;

B. Enter a permanent injunction restraining the defendants, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

    1. Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; and

    2. Section 17(a) of the Securities Act [15 U.S.C. §77q(a)];

C. Require the defendants and relief defendants to disgorge their ill-gotten gains, plus prejudgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D. Order the defendants to pay an appropriate civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. §77t(d)];

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Frank C. Huntington
Frank C. Huntington (Mass. Bar No. 544045)
 Senior Trial Counsel
Michael J. Vito (Mass. Bar No. 675524)
 Enforcement Counsel
Celia D. Moore (Mass. Bar No. 542136)
 Assistant Regional Director
Martin F. Healey (Mass Bar No. 227550)
 Regional Trial Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA 02110
(617) 573-8960 (Huntington direct)
(617) 573-4590 (fax)
huntingtonf@sec.gov (Huntington email)

Dated: April 1, 2015