# PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT (the "**Agreement**") is entered into as of the Effective Date by CAPITAL FINANCIAL PARTNERS, LLC, a Massachusetts limited liability company ("**Lead**"), and the undersigned participant (the "**Subject Participant**").

## RECITALS

A.   Lead has made a loan to Client (as defined herein) in the aggregate principal amount of One Million Seven Hundred Thousand Dollars ($1,700,000.00) (the "**Loan**"), upon and subject to the terms and conditions of the Loan Documents (as defined herein);

B.   The Subject Participant desires to purchase from Lead, and Lead desires to sell to the Subject Participant, an undivided beneficial interest in Lead's right to receive Collections (as defined herein), together with certain other rights as more particularly described herein (each such undivided beneficial interest sold by Lead to the Subject Participant or any third party is a "**Participation**");

C.   The Subject Participant is making certain representations regarding its qualifications as a purchaser of a Participation, and Lead is relying upon such representations as a material inducement to enter into this Agreement; and

D.   The Subject Participant acknowledges that Participations may be sold by Lead to other individuals and/or entities who make representations substantially similar to the representations made by the Subject Participant in this Agreement (such other individuals and/or entities and the Subject Participant are collectively, "**Participants**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, it is hereby agreed as follows:

## AGREEMENT

**1.   DEFINITIONS.**  All capitalized terms not defined herein shall have the meaning set forth in the Uniform Commercial Code, as adopted in the Chosen State.  As used herein the following terms have the following meanings.

1.1.   "**Advances**" means the aggregate principal amount of funds advanced by Lead to Client pursuant to the Loan Documents.

1.2.   "**Agreement**" means this Participation Agreement.

1.3.   "**Business Day**" means a day other than one on which national banks are required or permitted to be closed.

1.4.   "**Chosen State**" means Florida.

1.5. "**Client**" means ▆▆▆▆▆▆.

1.6. "**Client Obligations to be Paid to Participants**" means the amounts shown in the table below:

| Payment Number: | Payment Date: | Payment Amount: |
|---|---|---|
| 1 | 9/15/2015 | $231,625.00 |
| 2 | 9/30/2015 | $231,625.00 |
| 3 | 10/15/2015 | $231,625.00 |
| 4 | 10/30/2015 | $231,625.00 |
| 5 | 11/15/2015 | $231,625.00 |
| 6 | 11/30/2015 | $231,625.00 |
| 7 | 12/15/2015 | $231,625.00 |
| 8 | 12/30/2015 | $231,625.00 |

The Subject Participant acknowledges and agrees that (a) the total payments to be made by Client under the Loan Documents exceed the Client Obligations to be Paid to Participants and (b) Lead shall be entitled to retain such excess for its own account.

1.7. "**Collections**" means all funds received by Lead in payment of Client Obligations to be Paid to Participants.  For avoidance of doubt, Client funds held by Lead in respect of future Client Obligations to be Paid to Participants shall not be deemed part of Collections unless and until Lead has the right under the Loan Documents to apply such funds to unpaid Client Obligations to be Paid to Participants.

1.8. "**Direct Deposit Agreement**" means that certain Direct Deposit Agreement entered into among Lead, Client and Client's employer in substantially the form attached as an exhibit to the Loan Agreement.

1.9. "**Effective Date**" means the date upon which this Agreement has been executed and delivered by both Parties.

1.10. "**Extraordinary Expenses**" means:

1.10.1.  Attorneys' fees and disbursements, court costs and fees of any outside agency incurred subsequent to Lead's declaring the Loan to be "in liquidation", as described in Section 10 hereof, in connection with the enforcement of any of Lead's rights and remedies under the Loan Documents.

1.10.2.  Extraordinary Expenses shall not include expenses (i) of ordinary overhead or ordinary payments made to clerical personnel or executives of Lead or (ii) which would not have been incurred but for Lead's deviation from the Standard of Care.

1.11.  "**Loan Agreement**" means that certain Loan Agreement entered into on or about the date hereof between Lead and Client.

1.12.  "**Loan Documents**" means the Note, the Loan Agreement, the Loan Application, and the Direct Deposit Agreement, as the same may be amended from time to time.

1.13.  "**Lead**" means Capital Financial Partners, LLC, a Massachusetts limited liability company.

1.14.  "**Major Change**" means an amendment to the terms of the Loan Documents which has or may have any of the following effects:

    1.14.1.  A reduction of the Client Obligations to be Paid to Participants;

    1.14.2.  An extension of the maturity date of the Note; or

    1.14.3.  An increase in the maximum amount of credit to be provided by Lead to Client.

1.15.  "**Majority Participants**" means Participants whose Participation Percents exceed fifty percent (50%) in the aggregate.

1.16.  "**Participants**" has the meaning set forth in the Recitals.

1.17.  "**Participations**" has the meaning set forth in the Recitals.  All Participations shall be equal in priority and pari passu with one another.

1.18.  "**Participation Amount**" means the dollar amount of funds paid by a Participant for his, her or its Participation.  The Participation Amount of the Subject Participant is set forth below the signature of the Subject Participant on the signature page to this Agreement.

1.19.  "**Participation Percent**" means, with respect to any Participant, the percentage determined by dividing the Participation Amount of such Participant by the aggregate amount of Advances.

1.20.  "**Parties**" means Lead and the Subject Participant (each individually referred to as a "Party")

1.21.  "**Person**" means any natural person, corporation, limited liability company, unincorporated organization, partnership, association, joint stock company, joint venture, trust or any other entity.

1.22. "**Standard of Care**" means the same degree of care that Lead follows in similar transactions for its own account.

1.23. "**Subject Participant**" has the meaning set forth in the Preamble.

2. **SALE OF PARTICIPATION.**

Upon payment by the Subject Participant to Lead of the Subject Participant's Participation Amount, Lead shall have sold to the Subject Participant, and the Subject Participant shall have purchased from Lead, without recourse, a Participation consisting of an undivided pro rata (based on the Subject Participant's Participation Percent) interest in all Collections, together with certain other rights, as more particularly described herein.

3. **PROCEDURE AND PAYMENTS**

3.1. Lead has furnished the Subject Participant with copies of all Loan Documents. In the event of any supplement or amendment to the Loan Documents, Lead shall promptly furnish the Subject Participant with a copy of same. In addition, in the event Lead receives any material correspondence from Client relating to the Loan Documents, Lead shall promptly furnish the Subject Participant with a copy of same.

3.2. All payments received by Lead under the Loan Documents will be applied by Lead at such time and in such manner as is provided in the Loan Documents.

3.3. Within two (2) Business Days following Lead's receipt of any Collections, Lead shall pay to the Subject Participant, via Fed wire transfer, the Subject Participant's Participation Percent of such Collections. Collections received by the Subject Participant's depository bank, after 1 PM Eastern Time will be deemed received by the Subject Participant on the next Business Day.

4. **EXTRAORDINARY EXPENSES OF LEAD.**

Subject Participant agrees to pay to Lead as promptly as practicable after Lead's request therefor, or Lead may withhold and deduct from any funds it is otherwise obligated to disburse to the Subject Participant, the Subject Participant's Participation Percent of all Extraordinary Expenses.

5. **MANAGEMENT DUTIES OF LEAD.**

5.1. All transactions contemplated by the Agreement shall be conducted in Lead's name.

5.2. Lead shall administer the Loan in accordance with the Standard of Care.

Lead may amend the terms of the Loan Documents without the prior consent of the Subject Participant so long as such amendment is consistent with the Standard of Care and is not a Major Change.  Lead shall not have any duties or responsibilities to the Subject Participant except those expressly set forth herein, nor shall Lead have any fiduciary relationship with the Subject Participant, and no implied covenants, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against Lead. The provisions of this Agreement are solely for the benefit of Lead and the Subject Participant, and neither Client nor any other third party shall not have any rights as a third party beneficiary of any of the provisions hereof.

       5.3.	If Client is traded to another team, Lead shall coordinate with such new employer to have the payments on the Loan remitted by such new team to the Funding Account (as defined in the Loan Agreement).

## 6.	SECURITY INTEREST.

As collateral securing Lead's obligations to the Subject Participant hereunder, Lead hereby grants to the Subject Participant a security interest in the Loan Documents proportionate to the Subject Participant's Participation Percent *but not in* any of Lead's other present or future Accounts, Instruments, Documents, Chattel Paper, General Intangibles, Investment Property, loans, and/or the proceeds of any of the foregoing.

## 7.	COVENANTS, WARRANTIES AND REPRESENTATIONS OF LEAD.

Lead covenants, warrants and represents that:

       7.1	The Loan Documents and related documents have been duly executed.

       7.2	To the best of Lead's knowledge, Client does not have or does not believe that Client has any defense to payment of Client Obligations to be Paid to Participants nor any claim against Lead.

       7.3	Lead is not aware of any material adverse facts concerning the Loan which have not been disclosed to the Subject Participant.

## 8.	DUE DILIGENCE; NO RELIANCE; QUALIFICATIONS.

       8.1	Lead has previously furnished the Subject Participant with the loan application of Client as provided to Lead by Client.  Lead has made available to the Subject Participant for inspection all material information delivered by Client to Lead.

       8.2	The Subject Participant represents and warrants to Lead that the Subject Participant: (a) has sufficient knowledge, expertise and experience in lending, finance and business matters to independently determine whether or not to purchase his, her or its Participation; (b)  has had an opportunity to complete a thorough due diligence investigation in

connection with the Loan and his, her or its Participation, and consult with his, her or its legal and financial advisors regarding same; (c) has had an opportunity to complete a thorough review of the Loan Documents and this Agreement and consult with his, her or its legal and financial advisors regarding same; (d) has experience evaluating transactions similar in size and nature to the Loan and is not relying upon Lead in any respect to assist in evaluating the Loan or his, her or its Participation; (e) has obtained such information as the Subject Participant deems necessary (including any information that the Subject Participant independently obtained from Client or others) prior to making the decision to purchase his, her or its Participation; (f) has made his, her or its own independent analysis of Client's authority, creditworthiness, and ability to perform Client's obligations under the Loan Documents and has relied on such review in making Subject Participant's decision to purchase the Participation; (g) qualifies as an "accredited investor" as such term is defined by Federal securities laws (even though the Parties do not believe that the Participations are or should be considered "securities" as such term is defined by any Federal or State laws); and (h) is able to bear the risk associated with acquiring an interest in the Loan.

        8.3    The Subject Participant agrees that the Subject Participant will continue to rely solely upon the Subject Participant's independent review of the facts and circumstances related to Client and the Loan in making future decisions with respect to all matters under or in connection with the Loan and his, her or its Participation. Lead makes no representation or warranty and assumes no responsibility with respect to the due execution, validity, sufficiency, enforceability or collectability of the Loan under the Loan Documents or the Loan Documents themselves or with respect to the accuracy and completeness of matters disclosed, represented or warranted in the Loan Documents by Client (including financial matters). Lead assumes no responsibility for the financial conditions of Client or for the payment or performance of Client's obligations under the Loan Documents. Any and all term sheets, draft documents, presentation materials and other communications received by the Subject Participant from Lead or any third person in connection with the Loan or the Participation (collectively, "**Preliminary Materials**") have been superseded in their entirety by the terms and conditions of this Agreement or the Loan Documents, as the case may be, and the Subject Participant has been advised that the terms of the transaction may have changed since the date of such Preliminary Materials. This Agreement sets forth the entire understanding and agreement of Lead and the Subject Participant with regard to the matters contemplated hereby, and the Loan Documents set forth the entire understanding and agreement of Lead and Client with regard to the matters contemplated thereby.

    **9.**    **AUDITS BY THE SUBJECT PARTICIPANT.**

The Subject Participant shall have the right, at his, her or its own expense, at reasonable intervals to visit Lead's premises during normal business hours and upon reasonable notice, to inspect, audit, make copies of, and make extracts from Lead's records pertaining to his, her or its Participation and the Loan.

    **10.**    **IN LIQUIDATION.**

10.1.   Lead may declare the Loan to be "in liquidation" by so advising the Subject Participant in writing, at any time that an Event of Default has occurred under the Loan Documents.

10.2.   After the date on which Lead has declared the Loan to be "in liquidation" as described in Section 10.1, Lead shall consult with the Majority Participants on all material aspects of the administration of the Loan, and shall not take or refrain from taking any material action to enforce or protect its rights thereunder without the concurrence of the Majority Participants.

11. **ASSIGNMENT OF LOAN DOCUMENTS BY LEAD.**

11.1.   Upon Lead becoming insolvent or ceasing operations as a going concern, or upon a material breach by Lead which is not cured within thirty (30) days following the Subject Participant's delivery of written notice of such breach to Lead, the Majority Participants shall have the right upon written demand to require Lead to assign the Loan Documents to a representative designated by such Majority Participants.

11.2.   In the event of any such assignment, the Subject Participant hereby assumes his, her or its Participation Percent of all obligations of Lead arising under the Loan Documents at any time on or after such assignment, releases Lead from all further obligations and liabilities under this Agreement or the Loan Documents following such assignment (provided nothing herein shall release Lead from any liability for any breach of this Agreement or the Loan Documents occurring prior to such assignment).

11.3.   Following any assignment of the Loan Documents pursuant to this Section 11, the Subject Participant will: (a) reasonably cooperate with all other Participants in their efforts to enforce the assigned rights and administer and collect the Loan;  (b) comply with all reasonable requests of the Majority Participants; and (c) in the event any Extraordinary Expenses are reasonably incurred on behalf of all Participants with the approval or at the direction of the Majority Participants, reimburse the party incurring such Extraordinary Expenses, promptly following demand, for the Subject Participant's Participation Percent of such Extraordinary Expenses.

11.4.   Lead shall fully cooperate with Participants and shall execute all documents reasonably required (provided that the form and substance of such documents must be reasonably acceptable to Lead) to effectuate an assignment of the Loan Documents pursuant to this Section 11.

11.5.   This Section 11 sets forth the sole and exclusive remedy of the Subject Participant and the other Participants in the event of any breach of this Agreement or the Loan Documents by Lead, except for any breach involving gross negligence or willful misconduct.

11.6.   Upon any breach by Client, Lead will cooperate with Participants in

collecting the Loan; however, except as otherwise set forth herein, Lead will not be responsible for repayment of the Loan. Participants will be responsible for all out of pocket expenses, including filing fees and attorney's fees, associated with taking action as a result of a default by Client.

12.    **EXCULPATION AND INDEMMNIFICATION OF LEAD.**

12.1. NEITHER LEAD NOR ANY OF ITS DIRECTORS, OFFICERS, AGENTS OR EMPLOYEES SHALL BE LIABLE FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN BY IT OR THEM HEREUNDER OR IN CONNECTION WITH THE LOAN OR ANY OTHER MATTER CONTEMPLATED BY THIS AGREEMENT EXCEPT FOR ITS OR THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. LEAD SHALL NOT BE RESPONSIBLE TO ANY PARTICIPANT FOR ANY RECITALS, STATEMENTS, WARRANTIES OR REPRESENTATIONS CONTAINED IN THE LOAN DOCUMENTS OR FOR ITS FAILURE TO ASCERTAIN OR INQUIRE AS TO THE FAILURE OF PERFORMANCE OR OBSERVANCE OF ANY OF THE TERMS, CONDITIONS, COVENANTS OR AGREEMENTS CONTAINED IN THE LOAN DOCUMENTS BY OR ON BEHALF OF CLIENT UNDER THE LOAN DOCUMENTS. LEAD SHALL NOT BE RESPONSIBLE TO ANY PARTICIPANT FOR THE DUE EXECUTION, GENUINENESS, VALIDITY, ENFORCEABILITY OR EFFECTIVENESS OF THE LOAN DOCUMENTS OR FOR THE DESCRIPTION OF, VALUE OF OR TITLE TO ANY COLLATERAL FOR THE LOAN OR FOR THE CREDITWORTHINESS OF CLIENT; AND LEAD SHALL BE ENTITLED TO RELY ON ANY PAPER OR DOCUMENT BELIEVED BY IT TO BE GENUINE AND CORRECT AND TO HAVE BEEN EXECUTED OR SENT BY THE PROPER PERSON OR PERSONS.  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN, LEAD SHALL HAVE NO DUTY TO TAKE ANY AFFIRMATIVE STEPS TO ENFORCE ANY MORTGAGE OR SECURITY INTEREST. LEAD MAY EXECUTE ANY OF ITS DUTIES, POWERS OR AUTHORITIES HEREUNDER BY OR THROUGH AGENTS OR EMPLOYEES, AND SHALL BE ENTITLED TO RETAIN COUNSEL AND TO ACT IN RELIANCE UPON THE ADVICE OF SUCH COUNSEL CONCERNING ALL MATTERS PERTAINING TO ITS DUTIES, POWERS AND AUTHORITIES HEREUNDER AND UNDER THE LOAN DOCUMENTS.

12.2.   The Subject Participant hereby agrees to indemnify Lead and to hold Lead harmless for a proportionate share (equal to his, her or its Participation Percent) of any and all costs, expenses (including reasonable attorneys' fees), damages, losses or liabilities suffered or incurred by Lead by reason of its acting or having acted as Lead hereunder, except to the extent the same have resulted from gross negligence or willful misconduct of Lead or any of its directors, officers, agents or employees.

13.    **ASSIGNMENT OF PARTICIPATIONS**

No Participant shall at any time assign its interest in this Agreement or in the Loan Documents except with the prior written consent of the Lead as determined in Lead's sole and absolute discretion. Any assignment made or purported to be made in violation of this Section 13

shall be void ab initio and of no force and effect whatsoever.

### 14.   ENTIRE AGREEMENT.

The Agreement supersedes all other agreements and understandings between the Parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of the Agreement.

### 15.   G ENERAL.

15.1.   **Amendment.**   Neither this Agreement nor any provisions hereof may be changed, waived, discharged, or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by the Parties. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

15.2.   **Attorney's Fees**.   In the event that either Party finds it necessary to retain counsel in connection with the interpretation, defense, or enforcement of this Agreement, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing Party by its counsel in similar matters.

15.3.   **No Waiver.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which a Party may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver of any breach or default be deemed a waiver of any default or breach subsequently occurring.  All rights and remedies granted to each Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy.

15.4.   **Choice of Law.**   The Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

15.5.   **Further Acts.** Each Party agrees to do such further acts and things and to execute and deliver such additional agreements, powers and instruments as any other Party hereto may reasonably request to carry into effect the terms, provisions and purposes of this Agreement or to better assure and confirm unto such other Party hereto its respective rights, powers and remedies hereunder.

15.6.   **Counterparts**. This Agreement may be executed in any number of

counterparts, all of which taken together shall constitute one and the same instrument and either Party may execute this Agreement by signing any such counterpart.  A telecopied, pdf (portable document format) or other electronic signature on this Agreement or any counterpart shall be effective as the signature of the Party executing the Agreement or such counterpart for purposes of effectiveness of this Agreement.

15.7.   **Notices**.   All notices, demands and communications given or made hereunder or pursuant hereto shall be in writing and shall be delivered by Federal Express, UPS or other national courier via overnight delivery, addressed in each case as follows and shall be deemed to have been given or made when so delivered:

| | |
|---|---|
| Subject Participant: | To the address set forth below Subject Participant's signature on the signature page hereto. |
| Lead: | Capital Financial Partners, LLC<br>470 Atlantic Ave., 4th Floor<br>Boston, MA 02210 |
| with copy to: | Tobin & Reyes, P.A.<br>225 N.E. Mizner Boulevard, Suite 510<br>Boca Raton, FL  33432<br>Attention:  J. Robert Joines, Esq. |

or to such other address as either Party may designate by written notice to the other Party.  Each such notice, request and demand shall be deemed given or made upon delivery or refusal of delivery.

15.8.   **Entire Agreement**.  This Agreement represents the final Agreement between the parties with regard to the subject matters hereof.  None of the terms and conditions set forth in this Agreement may be contradicted by any Preliminary Materials or other evidence of prior, contemporaneous or subsequent oral agreements of the Parties.

15.9.   **WAIVER OF JURY TRIAL**.   THE PARTIES HEREBY MUTUALLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT AND ANY AGREEMENT CONTEMPLATED OR TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF EITHER PARTY. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO LEAD IN ENTERING INTO THIS AGREEMENT, AND, THAT LEAD WOULD NOT HAVE ENTERED INTO THIS AGREEMENT WITHOUT THIS JURY TRIAL WAIVER, AND, THAT THE SUBJECT PARTICIPANT HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY REGARDING

THIS JURY TRIAL WAIVER, AND, UNDERSTANDS THE LEGAL EFFECT OF THIS JURY TRIAL WAIVER.

[SIGNATURE PAGE FOLLOWS]

     IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

LEAD:

**CAPITAL  FINANCIAL  PARTNERS, LLC**

By_____

Name_____

Title_____

Date_____

THE SUBJECT PARTICIPANT:

_____

▇▇▇▇▇▇▇▇▇

THE SUBJECT PARTICIPANT'S ADDRESS:

▇▇▇▇▇▇▇▇▇▇▇, MA 02459

THE SUBJECT PARTICIPANT'S PARTICIPATION AMOUNT: **$100,000**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

LEAD:

**CAPITAL FINANCIAL PARTNERS, LLC**

By _[signature]_

Name _Susan C Darby_

Title _Managing Partner_

Date _3/27/15_

THE SUBJECT PARTICIPANT:

_[redacted]_

THE SUBJECT PARTICIPANT'S ADDRESS:

_[redacted]_ MA 02459

THE SUBJECT PARTICIPANT'S PARTICIPATION AMOUNT: $100,000